**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KARON NARINE, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **Case No.** |
| Plaintiff, | ) ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) |
| TOP SHIPS INC., EVANGELOS J. PISTIOLIS, ALEXANDROS TSIRIKOS, KALANI INVESTMENTS LIMITED, MURCHINSON LTD. and MARC BISTRICER, | ) **JURY TRIAL DEMANDED** ) ) ) ) |
| Defendants. | ) ) |

**CLASS ACTION COMPLAINT**

Plaintiff Karon Narine ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Top Ships, Inc. ("Top Ships" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Top Ships securities

1

between January 17, 2017 and August 22, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Top Ships is an international provider of oil, petroleum products and chemicals transportation services.

3.     Founded in 2000, the Company was formerly known as "Top Tankers Inc." and changed its name to "Top Ships Inc." in December 2007. Top Ships is based in Maroussi, Greece and its stock trades on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "TOPS."

4.     Through his control of Top Ships, Evangelos J. Pistiolis ("Pistiolis"), the Company's CEO, caused Top Ships to engage in a series of manipulative share issuance/sales transactions with Kalani Investments Limited and certain of its related entities ("Kalani") through which Top Ships would sell its common shares and securities convertible into common shares to Kalani at a significant discount to market price and file registration statements so that Kalani could resell these shares into the market; that when Kalani's sales of Top Ships stock caused the price of Top Ships stock to decline, Top Ships would reverse split the stock, causing a certain number of outstanding shares to be merged into a single share, and thereby raise the price of Top Ships stock; and that Top Ships would again sell securities to Kalani and the same pattern of transactions would ensue.

5.     By August 2017, Top Ships, through Kalani, had issued and sold into the market tens of millions of shares of its common stock, vastly diluting the Company's existing

shareholders. While Top Ships has allegedly used the proceeds from these offerings to further enrich Pistiolis and his affiliates through various related-party transactions, the value of Top Ships common stock has dropped over 99%.

6.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the true purpose of the proxy proposal was to further Defendants' Reverse Split Share Issuance Scheme and enable Top Ships to finance a variety of related-party transactions in order to enrich Pistiolis and his affiliates; (ii) Defendants intended to repeatedly engage in securities issuances and related reverse splits thereby manipulating the market for Top Ships stock; and (iii) as a result of the foregoing, Top Ships' public statements were materially false and misleading at all relevant times.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

10.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). The acts and transactions giving rise to the violations of

law complained of occurred in part in this District. The false and misleading statements were disseminated in this District, and the manipulative conduct was carried out in part in this District.

11.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.    Plaintiff, as set forth in the attached Certification, acquired Top Ships securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.    Defendant Top Ships is based in Greece, with principal executive offices located at 1 Vasilisis Sofias and Megalou Alexandrou Street, Maroussi 15124, Greece.  Top Ships' shares trade on the NASDAQ under the ticker symbol "TOPS."

14.    Defendant Evangelos J. Pistiolis ("Pistiolis") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and Director.

15.    Defendant Alexandros Tsirikos ("Tsirikos") has served at all relevant times as the Company's Chief Financial Officer ("CFO") and Director.

16.    The Defendants referenced above in ¶¶ 14-15 are sometimes referred to herein as the "Individual Defendants."

17.    Defendant Kalani Investments Limited ("Kalani") is an entity organized under the laws of the British Virgin Islands and served as the underwriter and distributer of multiple offerings of Top Ships common stock during the Class Period as described herein.

18.    Defendant Murchinson Ltd. ("Murchinson") is reportedly a Toronto-based hedge fund behind Kalani.

19.    Defendant Marc Bistricer ("Bistricer") is reportedly the head of Murchinson and, therefore, controls Kalani.

20.    Defendants Kalani, Murchinson and Bistricer are referred to herein as the "Kalani Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.    Top Ships is an international owner and operator of tanker vessels focusing on the transportation of crude oil, petroleum products and bulk liquid chemicals. The Company is based in Maroussi, Greece. As of January 17, 2017, Top Ships' fleet consisted of six chemical tanker vessels, two of which were chartered.

22.    The Company is run by Defendant Pistiolis, the Company's CEO and President, who also owns a number of private companies, either directly or indirectly, that provide services to Top Ships and engage in material commercial business dealings with the Company.

23.    Defendant Pistiolis derives significant financial benefits from these relationships. For example, since 2014, Central Shipping Monaco SAM ("CSM"), an entity affiliated with Pistiolis, has provided all operational, technical, and commercial functions relating to the chartering and operation of Top Ships' vessels. Pursuant to various management agreements, Top Ships pays CSM a technical management fee of $572 per day per vessel for the provision of technical, operation, insurance, bunkering and crew management, commencing three months before the vessel is scheduled to be delivered by the shipyard, and a commercial management fee of $312 per day per vessel, commencing from the date the vessel is delivered from the shipyard.

In addition, the management agreements provide for payment to CSM of: (a) $520 per day for superintendent visits plus actual expenses; (b) a chartering commission of 1.25% on all freight, hire and demurrage revenues; (c) a commission of 1.00% of all gross sale proceeds or the purchase price paid for vessels; and (d) a commission of 0.2% on derivative agreements and loan financing or refinancing. CSM also performs supervision services for all of Top Ships' newbuilding vessels while the vessels are under construction, for which Top Ships pays CSM the actual cost of the supervision services plus a 7% fee.

24.     Similarly, Top Ships has entered into personnel agreements with Central Mare Inc. ("Central Mare"), an entity affiliated with Pistiolis, pursuant to which Top Ships pays Central Mare for providing the Company's executive officers, including Pistiolis. The Company has also entered into an unsecured revolving credit facility with Family Trading Inc. ("Family Trading"), an entity affiliated with Pistiolis, pursuant to which the Company pays Family Trading a fixed 10% interest rate for borrowing costs, for example in connection with financing the purchase of a new vessel.

25.     During the Class Period, Pistiolis' family trust, the Lax Trust, also beneficially owned, through various related entities, the majority of Top Ships' voting shares. As a result, Pistiolis was able to effectively control the Company's actions.

**Materially False and Misleading Statements Issued During the Class Period**

26.     The Class Period begins on January 17, 2017. On that date, the Company filed a shelf registration statement signed by Defendants Pistiolis and Tsirikos on Form F-3 for the sale of $200 million worth of Company securities and one million Top Ships common shares held by an institutional investor (together with its prospectus, the "Registration Statement").

27.    The Registration Statement contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation. For example, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(1) ("Item 303") required the Registration Statement to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Defendants failed to disclose their fraudulent scheme to manipulate the price of Top Ships common stock through a series of securities offerings and reverse stock splits in order to enrich themselves at shareholders' expenses. Moreover, the scheme needed to be disclosed under Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503") in the "Risk factors" section of the Registration Statement because the manipulative scheme was one of "the most significant factors that make the offering speculative or risky." Indeed, the scheme would ultimately result in shareholders losing more than 99% of the value of Top Ships' shares in a matter of months.

28.    In addition, the Registration Statement misleadingly touted purported "***anti-dilutive***" protections designed to protect shareholders. As an example, it stated that while certain convertible securities registered pursuant to the Registration Statement "may" dilute shareholders, the shares were subject to "anti-dilution adjustments" and if all such shares then outstanding were converted into common stock it would only dilute shareholders "approximately 38%." The Registration Statement further stated that the Company's Board of Directors ("Board") may take action "to prevent dilution." In fact, in less than four months from the date of the Registration Statement the Company would increase the number of its shares outstanding by more than 680% pursuant to the Reverse Split Share Issuance Scheme, effectively wiping out the Company's existing shareholders.

7

29.     The Registration Statement was declared effective on February 1, 2017. The next day, the Company filed a prospectus supplement to the Registration Statement on Form 424B5 for the issuance and sale of over $3.1 million worth of shares of Top Ships common stock to Kalani (together with the Registration Statement, the "February 2017 Prospectus Supplement"). The February 2017 Prospectus Supplement contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation. For example, Item 303 required the February 2017 Prospectus Supplement to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Defendants failed to disclose their fraudulent scheme to manipulate the price of Top Ships common stock through a series of securities offerings and reverse stock splits in order to enrich themselves at shareholders' expenses. Moreover, the scheme needed to be disclosed under Item 503 in the "Risk factors" section of the February 2017 Prospectus Supplement because the manipulative scheme was one of "the most significant factors that make the offering speculative or risky." Indeed, the scheme would ultimately result in shareholders losing more than 99% of the value of the shares purchased in the offering in a matter of months.

30.     The February 2017 Prospectus Supplement described a purchase agreement between Kalani and Top Ships by which the Company would sell to Kalani its common shares at a substantial discount to market price pursuant to a convoluted, variable formula, the details of which left much to the undisclosed discretion of Kalani and Company insiders and was designed to allow Defendants to obscure the true magnitude of potential dilution and risk of economic loss to the Company's outside shareholders (the "Stock Purchase Agreement"). Over the next several

weeks, Kalani, in turn, sold its newly acquired shares to the investing public thereby acting as an underwriter and distributor of the shares sold and further diluting the interests of Top Ships common stock holders and causing a decline in the price of Top Ships common stock. The following excerpt from the February 2017 Prospectus Supplement illustrates some aspects of the formula by which the number of shares issued to Kalani would be calculated under the Stock Purchase Agreement:

From time to time over the term of the Purchase Agreement, we may, in our sole discretion, provide the Investor with a Fixed Request Notice to purchase a specified Fixed Amount Requested of shares of our common stock over a Pricing Period commencing on the trading day specified in the applicable Fixed Request Notice, with each fixed request subject to the limitations discussed below. The Maximum Fixed Amount Requested to be purchased pursuant to any single Fixed Request Notice cannot exceed (i) $50,000, if the daily VWAP of the common stock is greater than $0.75per share on the trading day immediately preceding the applicable date on the Fixed Request Exercise Date and (ii) $10,000, if the VWAP of our common stock is equal to or below $0.75 per share on the trading day immediately preceding the applicable Fixed Request Exercise Date, unless we and the Investor mutually agree.

Once presented with a Fixed Request Notice, the Investor is required to purchase a pro rata portion of the Fixed Request Amount during the applicable Pricing Period for those trading days on which the VWAP equals or exceeds the applicable Floor Price (not taking into account the discount factor of 93.0% discussed below); provided, however, that at no time shall the Floor Price be lower than $0.50 per share, unless the Company and the Investor mutually agree. The per share purchase price for the shares of our common stock subject to a Fixed Request Notice will be equal to the product of a discount factor of 93.0% multiplied by the lowest daily VWAP that equals or exceeds the applicable Floor Price during the applicable Pricing Period. If the VWAP falls below the applicable Floor Price on any trading day during the applicable Pricing Period, the Purchase Agreement provides that the Investor will not be required to purchase the pro rata portion of the applicable Fixed Price Request Amount allocated to that trading day, unless the Investor elects to purchase those shares at the Floor Price multiplied by the discount factor of 93.0%. Each purchase pursuant to a Fixed Request will reduce, on a dollar-for-dollar basis, the Total Commitment under the Purchase Agreement. The payment for, against subsequent delivery of, Shares in respect of each Fixed Request shall be settled on the Settlement Date therefor, which will be the second trading day next following the last trading day of each Pricing Period, or on such earlier date as the parties may mutually agree.

We are prohibited from issuing a Fixed Request Notice if (i) the amount requested in such Fixed Request Notice exceeds the Maximum Fixed Amount Requested, (ii) the sale of shares of our common stock pursuant to such Fixed Request Notice would cause us to issue or sell or the Investor to acquire or purchase an aggregate dollar value of shares of our common stock that would exceed $3,099,367, or (iii) the sale of shares of our common stock pursuant to the Fixed Request Notice would cause us to sell or the Investor to purchase an aggregate number of shares of our common stock which would result in beneficial ownership by the Investor of more than 4.9% of our common stock (as calculated pursuant to Section 13(d) of the Exchange Act and the rules and regulations thereunder). We cannot make more than one Fixed Request in any Pricing Period and must allow five trading days to elapse between the completion of a Pricing Period and the commencement of a Pricing Period for any other fixed request.

With respect to any Pricing Period, the Company may in its sole discretion grant to the Investor the right, in the Investor's sole discretion, to purchase, from time to time during the Pricing Period, all or any portion of an Optional Amount of common stock. The Optional Amount and the applicable Optional Amount Floor Price with respect to such Optional Amount, which may be the same or different to the Floor Price with respect to the applicable Fixed Request Notice, shall be set forth in the applicable Fixed Request Notice. The purchase price for any portion of the Optional Amount that the Investor chooses to purchase will be equal to the product of a discount factor of 93.0% multiplied by the Optional Amount Floor Price applicable to such Optional Amount. Each daily Optional Amount exercise shall be aggregated during the Pricing Period and settled on the Settlement Date for the applicable Fixed Request. The Optional Amount Floor Price designated by the Company in its Fixed Request Notice shall apply to each exercise of all or any portion of the Optional Amount during the applicable Pricing Period.

31.     On February 2, 2017, the price of Top Ships common stock closed at $2.08 per share on an unadjusted basis and the Company had approximately 5.7 million shares outstanding.

32.     On February 7, 2017, Top Ships filed a report on Form 6-K signed by Defendant Pistiolis stating that it had issued a $3.5 million promissory note to Kalani at a 6% discount to principal.

33.     On February 21, 2017, Top Ships filed a report on Form 6-K signed by Defendant Pistiolis stating that the Company had sold to a Kalani-affiliated entity 7,500 newly issued Series C Convertible Preferred Shares for $7.5 million (the "Series C Convertible Preferred Shares Purchase Agreement"). Pursuant to the Series C Convertible Preferred Shares Purchase

Agreement, signed by Defendant Tsirikos, the Series C Convertible Preferred shares were convertible into shares of Top Ships common stock pursuant to a convoluted, variable formula, the details of which left much to the undisclosed discretion of Kalani and Company insiders and was designed to allow Defendants to obscure the true magnitude of potential dilution and risk of economic loss to the Company's outside shareholders. As with the Stock Purchase Agreement, Kalani, in turn, sold its newly acquired shares following their conversion to the investing public thereby acting as an underwriter and distributor of the shares and further diluting the interests of Top Ships common stock holders and causing a decline in the price of Top Ships common stock. The following excerpt from the Series C Convertible Preferred Shares Purchase Agreement illustrates some aspects of the formula by which the number of shares issued to Kalani would be calculated upon their conversion into Top Ships common shares:

[4.] (b) Conversion Rate. The number of Common Shares issuable upon conversion of any Preferred Share pursuant to Section 4(a) shall be determined by dividing (x) the Conversion Amount of such Preferred Share by (y) the Conversion Price (the "Conversion Rate"):

(i) "Conversion Amount" means, with respect to each Preferred Share, as of the applicable date of determination, the sum of (1) the Stated Value thereof plus (2) the Additional Amount thereon and any accrued and unpaid Late Charges with respect to such Stated Value and Additional Amount as of such date of determination plus (3) the applicable Make-Whole Amount, if any.

(ii) "Conversion Price" means, with respect to each Preferred Share, as of any Conversion Date or other date of determination, $3.75, subject to adjustment as provided herein.

*** 

[4.] (f) Alternate Conversion.

(i) General. Subject to Section 4(d), at any time the VWAP of the Common Shares as of the Trading Day immediately prior to the date of determination is less than the Conversion Price then in effect, a Holder may, at such Holder's option, by delivery of a Conversion Notice to the Company (the date of any such Conversion Notice, each an "Alternate

Conversion Date"), convert all, or any number of Preferred Shares (such Conversion Amount of the Preferred Shares to be converted pursuant to this Section 4(f), the "<u>Alternate Conversion Amount</u>") into Common Shares at the Alternate Conversion Price (each, a "<u>Alternate Conversion</u>").

\*\*\*

[8.] (a) <u>Adjustment of Conversion Price upon Issuance of Common Shares.</u> If and whenever on or after the Initial Issuance Date the Company issues or sells, or in accordance with this <u>Section 8(a)</u> is deemed to have issued or sold, any Common Shares (including the issuance or sale of Common Shares owned or held by or for the account of the Company, but excluding any Excluded Securities issued or sold or deemed to have been issued or sold) for a consideration per share (the "<u>New Issuance Price</u>") less than a price equal to the Conversion Price in effect immediately prior to such issue or sale or deemed issuance or sale (such Conversion Price then in effect is referred to herein as the "<u>Applicable Price</u>") (the foregoing a "<u>Dilutive Issuance</u>"), then, immediately after such Dilutive Issuance, the Conversion Price then in effect shall be reduced to the New Issuance Price.

\*\*\*

[8.] (c) <u>Holder's Right of Adjusted Conversion Price</u>. In addition to and not in limitation of the other provisions of this <u>Section 8(c)</u> or <u>Section 4(n)</u> of the Securities Purchase Agreement, and excluding any Excluded Securities, if the Company in any manner issues or sells or enters into any agreement to issue or sell, any Common Shares, Options or Convertible Securities (any such securities, "<u>Variable Price Securities</u>") that are issuable pursuant to such agreement or convertible into or exchangeable or exercisable for Common Shares pursuant to such Options or Convertible Securities, as applicable, at a price which varies or may vary with the market price of the Common Shares, including by way of one or more reset(s) to a fixed price, but exclusive of such formulations reflecting customary anti-dilution provisions (such as share splits, share combinations, share dividends and similar transactions) (each of the formulations for such variable price being herein referred to as, the "<u>Variable Price</u>"), the Company shall provide written notice thereof via facsimile or electronic mail and overnight courier to each Holder on the date of such agreement and/or the issuance of such Common Shares, Convertible Securities or Options, as applicable. From and after the date the Company enters into such agreement or issues any such Variable Price Securities, each Holder shall have the right, but not the obligation, in its sole discretion to substitute the Variable Price for the Conversion Price upon conversion of the Preferred Shares by designating in the Conversion Notice delivered upon any conversion of Preferred Shares that solely for purposes of such conversion such Holder is relying on the Variable Price rather than the Conversion Price then in effect. A Holder's election to rely on a Variable Price for a particular conversion of Preferred Shares shall not obligate such Holder to rely on a Variable Price for any future conversions of Preferred Shares. For the

avoidance of doubt, the term "Variable Price Securities" shall not include any Excluded Securities.

\*\*\*

[8.] (g) Voluntary Adjustment by Company. The Company may at any time any Preferred Shares remain outstanding, with the prior written consent of the Required Holders, reduce the then current Conversion Price to any amount and for any period of time deemed appropriate by the Board of Directors.

\*\*\*

[30.] (e) "Alternate Conversion Price" means, as of any date of determination, the higher of (x) 75% of the lowest VWAP of the Common Shares for any Trading Day during the twenty-one (21) consecutive Trading Day period ending on, and including, the Trading Day immediately prior to such date of determination (to be appropriately adjusted for any stock split, stock dividend, stock combination or other similar transaction during such measuring period) and (y) the Floor Price; provided, however, that if a Triggering Event referred to in Section 30(yy)(ix)(C) has occurred and, if curable, has not been cured within thirty (30) days, "50%" shall replace "75%" in clause (x) of this Section 30(e) for all purposes hereunder with respect to which Alternate Conversion Price shall be applicable

\*\*\*

[30.] (x) "Floor Price" means $0.25.

34.    On February 21, 2017, Top Ships filed a report on Form 6-K signed by Defendant Pistiolis (the "February 21 Form 6-K"). The February 21 Form 6-K stated that Top Ships, through a wholly-owned subsidiary, had acquired a 40% interest in Eco Seven Inc. ("Eco Seven") from Malibu Shipmanagement Co. ("Malibu"), a wholly-owned subsidiary of a Pistiolis-affiliated family trust. Eco Seven was party to a shipbuilding contract for the construction of a chemical tanker and a charter for the vessel's operation.

35.    The February 21 Form 6-K also stated that Top Ships had amended and restated the Family Trading Credit Facility in order to, among other things, allow the Company to remove any limitation in the use of funds drawn down under the facility, reduce the mandatory cash payment due under the facility when the Company raises capital through the issuance of

certain securities, remove the revolving feature of the facility, and extend the facility for up to three years. Specifically, under the terms of the amended Family Trading Credit Facility, if the Company raised capital via the issuance of warrants, debt or equity, it would be obliged to repay any amounts due under the facility and any accrued interest and fees up to the time of the issuance in cash or in shares of the Company's common stock at Family Trading's option. On February 21 and 22 the Company issued 777,000 common shares as payment for $1.2 million for accrued commitment fees, extension fees and interest outstanding under the amended credit facility.

36.    On March 6, 2017, Top Ships filed a report on Form 6-K signed by Defendants Pistiolis and Tsirikos announcing a special meeting of stock holders to be held in order to consider and vote on a proposal to amend the Company's articles of incorporation to effect a reverse stock split (the "March 6 Form 6-K"). The March 6 Form 6-K stated that the "purpose of the reverse stock split is to increase the per share trading value of the Common Shares" and that the Company's Board "intends to effect the proposed reverse stock split only if it believes that a decrease in the number of Common Shares outstanding is likely to improve the trading price for the Common Shares, and only if the implementation of a reverse stock split is determined by the Board to be in the best interests of the Company and its shareholders." These statements were materially false and misleading when made because, as Defendants knew or were reckless in not knowing but failed to disclose, the true purpose of the proposal was to further Defendants' Reverse Split Share Issuance Scheme and enable Top Ships to finance a variety of related-party transactions in order to enrich Pistiolis and his affiliates. In addition, Defendants knew but failed to disclose that Defendants intended to repeatedly engage in stock issuances and related reverse splits thereby manipulating the market for Top Ships stock.

37.     On March 14, 2017, Top Ships filed its annual report of a foreign issuer for fiscal 2016 on Form 20-F, which was signed by Defendant Pistiolis. The Company reported $28 million in revenues and $1 million in net income before deemed dividend for the year.

38.     Also on March 14, 2017, Top Ships filed a post-effective amendment to a registration statement previously filed on Form F-1 (the "Warrants Registration Statement"), signed by Defendants Pistiolis and Tsirikos and regarding shares issuable upon the exercise of outstanding warrants registered in June 2014 (together with the Warrants Registration Statement, the "March 2017 Warrants Amendment"). The March 2017 Warrants Amendment registered Top Ships common stock underlying the exercise of the warrants registered under the Warrants Registration Statement (the "2014 Warrants"), or approximately 5.6 million shares at the then-current, but adjustable, exercise price for prospective proceeds of approximately $6.2 million. As with the Stock Purchase Agreement and the Series C Convertible Preferred Shares Purchase Agreement, common shares received on exercise of the 2014 Warrants could be resold into the market. The March 2017 Warrants Amendment contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation. For example, Item 303 required the March 2017 Warrants Amendment to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Defendants failed to disclose their fraudulent scheme to manipulate the price of Top Ships common stock through a series of securities offerings and reverse stock splits in order to enrich themselves at shareholders' expenses. Moreover, the scheme needed to be disclosed under Item 503 in the "Risk factors" section of the March 2017 Warrants Amendment because the manipulative scheme was one of "the most

significant factors that make the offering speculative or risky." Indeed, the scheme would ultimately result in shareholders losing more than 99% of the value of the shares purchased in the offering in a matter of months.

39.     The 2014 Warrants had a variable price and conversion ratio that allowed purchasers to convert the warrants into Top Ships common shares pursuant to a convoluted, variable formula, the details of which left much to the undisclosed discretion of the warrant purchasers and Company insiders and was designed to allow Defendants to obscure the true magnitude of potential dilution and risk of economic loss to the Company's outside shareholders. The following excerpt from the March 2017 Warrants Amendment illustrates some aspects of the formula by which the number of shares issued upon exercise of the warrants would be calculated:

> Pursuant to the terms of the Warrants, holders have the right, but not the obligation, in any exercise of Warrants, to designate the variable price offered by us pursuant to a issued variable rate security and purchase such proportionate number of common shares based on the variable price in effect on the exercise date. We have issued Series C Convertible Preferred Stock, which is convertible at the lower of (i) $3.75 or (ii) 75% of the lowest daily volume weighted average price of the Company's common stock for any trading day during the twenty-one (21) consecutive trading day period ending on, and including, the trading day immediately prior to such date of determination (but in no event will the conversion price be lower than $0.25), or the Conversion Ratio. If using the Conversion Ratio, as of March 10, 2017, each Warrant has an exercise price of $1.11 and entitles its holder to purchase 2.25 common shares, as may be further adjusted. The Conversion Ratio is subject to certain adjustments pursuant to the Statement of Designation of Rights, Preferences and Privileges of Series C Convertible Preferred Stock, or the Series C Statement of Designation, which is incorporated by reference to this registration statement of which this prospectus is a part.

***

*Anti-Dilution Provisions*

> The exercise price and the number of shares issuable upon exercise are subject to adjustment in the event of sales of our common shares at a price per share less than the exercise price then in effect (or securities convertible or

exercisable into common shares at a conversion or exercise price less than the exercise price then in effect). In addition, the exercise price and the number of shares issuable upon exercise are also subject to adjustment in the event of certain stock dividends and distributions, stock splits, stock combinations, reclassifications or similar events affecting our common shares, and also upon any distributions of assets, including cash, stock or other property to our shareholders.

40.     The provisions of the Stock Purchase Agreement, the Series C Convertible Preferred Shares Purchase Agreement and the March 2017 Warrants Amendment were interconnected, such that an issuance, conversion or exercise of the relevant securities under one agreement would impact the number and/or price of the common shares that could be issued under the other agreements, often subject to undisclosed variables that were within the sole discretion of Defendants and their affiliates. This interconnectedness of these agreements, together with their overall complexity and variability, was designed to and did further obscure the true magnitude of potential dilution and risk of economic loss to the Company's outside shareholders.

41.     On March 20, 2017, Top Ships filed a prospectus supplement to the Registration Statement on Form 424B5 increasing the previously announced issuance and sale of shares of Top Ships common stock to Kalani from $3.1 million to $6.9 million (together with the Registration Statement, the "March 20 2017 Prospectus Supplement"). The March 20 2017 Prospectus Supplement contained substantially the same materially false and misleading statements of fact and failed to disclose the facts and manipulative conduct required to be disclosed therein as those stated in ¶¶29-30 in the February 2017 Prospectus Supplement.

42.     On March 22, 2017, Top Ships filed a report on Form 6-K signed by Defendant Pistiolis stating that it had issued a $5 million promissory note to Kalani at a 4% discount to principal.

43.     On March 24, 2016, the results of the Company's special meeting of shareholders were announced. Under Pistiolis' influence and control, shareholders had approved a proposal to allow the Company to conduct reverse stock splits of up to 20-for-1.

44.     On March 27, 2017, Top Ships filed a prospectus supplement to the Registration Statement on Form 424B5 increasing the previously announced issuance and sale of shares of Top Ships common stock to Kalani from $6.9 million to $12.5 million (together with the Registration Statement, the "March 27 2017 Prospectus Supplement"). The March 27 2017 Prospectus Supplement contained substantially the same materially false and misleading statements of fact and failed to disclose the facts and manipulative conduct required to be disclosed therein as those stated in ¶¶29-30 and 41 in the March 20 Prospectus Supplement and the February 2017 Prospectus Supplement.

45.     That same day, the Company paid a $1.25 million cash "performance fee" to CSM, a company affiliated with Defendant Pistiolis. It also paid an additional aggregate cash bonus of $1.5 million to Top Ships' executive officers, including Defendants Pistiolis and Tsirikos.

46.     On March 28, 2017, Top Ships filed a report on Form 6-K signed by Defendant Pistiolis stating that it had issued a $10 million promissory note to Kalani.

47.     On April 5, 2017, Top Ships filed a prospectus supplement to the Registration Statement on Form 424B5 increasing the previously announced issuance and sale of shares of Top Ships common stock to Kalani from $12.5 million to $20.3 million (together with the Registration Statement, the "April 5 2017 Prospectus Supplement"). The April 5 2017 Prospectus Supplement contained substantially the same materially false and misleading statements of fact and failed to disclose the facts and manipulative conduct required to be

disclosed therein as those stated in ¶¶29-30, 41 and 44 in the March 27 Prospectus Supplement, the March 20 Prospectus Supplement and the February 2017 Prospectus Supplement.

48.    Also on April 5, 2017, Top Ships filed a report on Form 6-K signed by Defendant Pistiolis stating that Top Ships, through a wholly-owned subsidiary, had acquired an additional 9% interest in Eco Seven from Malibu (the "April 5 Form 6-K"). The April 5 Form 6-K also stated that Top Ships, through wholly-owned subsidiaries, had acquired a 49% interest in two additional vessels from entities owned by Lax Trust, a family trust of Pistiolis.

49.    That same day, Top Ships filed a report on Form 6-K signed by Defendant Pistiolis stating that it had issued a $7.7 million promissory note to Kalani.

50.    On April 26, 2017, Top Ships acquired a 100% ownership interest in a newbuilding chemical tanker from the Pistiolis-affiliated Lax Trust.

51.    On April 27, 2017, Top Ships filed a prospectus supplement to the Registration Statement on Form 424B5 increasing the previously announced issuance and sale of shares of Top Ships common stock to Kalani from $20.3 million to $40.3 million (together with the Registration Statement, the "April 27 2017 Prospectus Supplement"). The April 27 2017 Prospectus Supplement contained substantially the same materially false and misleading statements of fact and failed to disclose the facts and manipulative conduct required to be disclosed therein as those stated in ¶¶29-30, 41, 44 and 47 in the April 5 2017 Prospectus Supplement, the March 27 2017 Prospectus Supplement, the March 20 2017 Prospectus Supplement and the February 2017 Prospectus Supplement.

52.    On April 28, 2017, Top Ships filed a report on Form 6-K signed by Defendant Pistiolis stating that the Stock Purchase Agreement had been amended to lower the Floor Price to $0.216 per share, among other changes.

53.    On May 3, 2017, Top Ships filed a post-effective amendment to the Warrants Registration Statement for approximately 191,000 of the 2014 Warrants signed by Defendants Pistiolis and Tsirikos (together with the Warrants Registration Statement, the "May 2017 Warrants Amendment"). The May 2017 Warrants Amendment registered for resale into the market approximately 3 million shares of Top Ships common stock underlying the exercise of the 2014 Warrants at the then-current, but adjustable, exercise price for prospective proceeds of $18.5 million. The May 2017 Warrants Amendment contained substantially the same materially false and misleading statements of fact and failed to disclose the facts and manipulative conduct required to be disclosed therein as those stated in ¶¶38-39 in the March 2017 Warrants Amendment.

54.    By market close on May 10, 2017, the price of Top Ships common stock had declined to $0.18 per share on an unadjusted basis as a direct result of Defendants' dilutive securities offerings and share issuances. This price was 91% below the closing price of the Company's shares on February 2, 2017, when the Stock Purchase Agreement with Kalani was first announced. During this same time frame, the number of Company shares outstanding had ballooned from approximately 5.7 million shares to 44.6 million, an increase of more than 680%.

55.    Also on May 10, 2017, Top Ships filed a report on Form 6-K stating that it would effect a 20-for-1 reverse stock split of the Company's common shares. This reduced the number of Top Ships' outstanding common shares from approximately 44.6 million shares to approximately 2.2 million shares, which began trading on a split-adjusted basis on May 11, 2017. The reverse stock split resulted in a temporary increase in the unadjusted share price of Top Ships common stock from a close of $0.18 per share on May 10, 2017 to a close of $1.83 per share on May 11, 2017, the next trading day. However, this increase did not offset the loss in

value to shareholders of having their shares merged, and the price of the shares actually declined over 47% on an adjusted basis.

56.    On May 15, 2017, Top Ships filed a press release on Form 6-K stating that it had issued a $5 million promissory note to Xanthe Holdings Ltd. ("Xanthe"), an affiliate of Kalani.

57.    On May 19, 2017, the Company filed shareholder proxy materials for its upcoming annual general meeting of shareholders on Form 6-K, which was signed by Defendants Pistiolis and Tsirikos. The proxy sought shareholder approval for a proposal to amend and restate Top Ships' articles of incorporation in order to allow the Company to effect one or more reverse stock splits of up to 1000-for-1 shares. The proxy stated that the Board would effect a reverse split:

> ***only*** if it believes that a decrease in the number of Common Shares outstanding is ***likely to improve the trading price*** for the Company's Common Shares, and ***only*** if the implementation of a reverse stock split is determined by the Board of Directors to be in ***the best interests of the Company and its shareholders***.

58.    On May 30, 2017, Top Ships filed a press release on Form 6-K stating that it had purchased an additional 41% interest in Eco Seven from a related party for $6.5 million. The press release stated that, in addition to the ship owned by Eco Seven, the Company had purchased a 49% interest in two vessels and a 100% interest in one more vessel since February 2017. The release further stated that the $28.2 million spent by the Company on these investments had been raised through securities offerings such as those with Kalani. The press release quoted Defendant Pistiolis as stating:

> As a result of this strategy, the Company remains cashflow positive after meeting all of its operating and senior debt obligations. Furthermore on current vessel valuations our fleet is leveraged less than 60%. ***Our business strategy continues to be focused on further expanding our fleet*** as we take delivery of our 3 remaining new buildings next year and employ them under medium term fixed rate contracts.

59.     The statements referenced in ¶¶ 26-30, 32-39, 41-49, 51-53, and 56-58 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the true purpose of the proxy proposal was to further Defendants' Reverse Split Share Issuance Scheme and enable Top Ships to finance a variety of related-party transactions in order to enrich Pistiolis and his affiliates; (ii) Defendants intended to repeatedly engage in securities issuances and related reverse splits thereby manipulating the market for Top Ships stock; and (iii) as a result of the foregoing, Top Ships' public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

60.     On June 8, 2017, Top Ships filed a prospectus supplement to the Registration Statement on Form 424B5 (together with the Registration Statement, the "June 2017 Prospectus Supplement"). Notably, the June 2017 Prospectus Supplement related to the exercise of 2.4 million 2014 Warrants. The June 2017 Prospectus Supplement stated that it was being filed in connection with the Registration Statement rather than the Warrants Registration Statement "due to the adjustable conversion feature of the Warrants and the increase in the number of common shares currently issuable upon exercise of the Warrants." The June 2017 Prospectus Supplement registered 23.9 million shares of Top Ships common stock for resale into the market underlying the exercise of the 2014 Warrants at the then-current, but adjustable, exercise price for prospective proceeds of $27.8 million. The June 2017 Prospectus Supplement contained substantially similar materially false and misleading statements of fact and failed to disclose the

facts and manipulative conduct required to be disclosed therein as those stated in ¶¶38-39 and 53.

61.    On June 9, 2017, the Company held its annual general meeting of shareholders. Under Pistiolis' influence and control, shareholders approved a proposal to allow the Company to conduct additional reverse stock splits of up to 1000-for-1.

*62.*    By market close on June 22, 2017, the price of Top Ships common stock had declined to $0.16 per share on an unadjusted basis as a direct result of Defendants' dilutive securities offerings and share issuances. This price was 91% below the closing price of the Company's shares on May 11, 2017, after the Company's previously announced 20-for-1 reverse stock split took effect. During this same time frame, the number of Company shares outstanding had ballooned from approximately 2.2 million shares to 21.6 million, ***an increase of more than 880%.***

63.    Also on June 22, 2017, Top Ships filed a report on Form 6-K stating that it would effect a 15-for-1 reverse stock split of the Company's common shares. This reduced the number of Top Ships' outstanding common shares from approximately 21.6 million shares to approximately 1.4 million shares, which began trading on a split-adjusted basis on June 23, 2017. The reverse stock split resulted in a temporary increase in the unadjusted share price of Top Ships common stock from a close of $0.16 per share on June 22, 2017 to a close of $0.80 per share on June 23, 2017, the next trading day. However, this increase did not offset the loss in value to shareholders of having their shares merged, and the price of the shares ***actually declined 67%*** on an adjusted basis.

64.    On June 26, 2017, Top Ships filed a press release on Form 6-K stating that it had issued a $3 million promissory note to Kalani.

65.    On July 11, 2017, Top Ships filed a press release on Form 6-K stating that it had issued an approximately $3 million promissory note to Xanthe.

66.    By market close on August 2, 2017, the price of Top Ships common stock had declined to $0.24 per share on an unadjusted basis as a direct result of Defendants' dilutive securities offerings and share issuances. This price was 70% below the closing price of the Company's shares on June 23, 2017, after the Company's previously announced 15-for-1 reverse stock split took effect.  During this same time frame, the number of Company shares outstanding had ballooned from approximately 1.4 million shares to 18.7 million, ***an increase of more than 1,230%.***

67.    Also on August 2, 2017, Top Ships filed a report on Form 6-K stating that it would effect a 30-for-1 reverse stock split of the Company's common shares. This reduced the number of Top Ships' outstanding common shares from approximately 18.7 million shares to approximately 0.6 million shares, which began trading on a split-adjusted basis on August 3, 2017. The reverse stock split resulted in a temporary increase in the unadjusted share price of Top Ships common stock from a close of $0.24 per share on August 2, 2017 to a close of $2.30 per share on August 3, 2017, the next trading day. However, this increase did not offset the loss in value to shareholders of having their shares merged, and the price of the shares ***actually declined more than 68%*** on an adjusted basis.

68.    On August 3, 2017, Top Ships filed its financial results of a foreign issuer for the six months ended June 30, 2017 on Form 6-K. Compared to the same time period the previous fiscal year, the Company's total expenses had increased more than 65% to $19.5 million. Many of these increased expenses flowed to Defendant Pistiolis and his associates by way of his ownership of the various entities that provided services to Top Ships and its fleet. For example,

management fees paid by the Company to related parties increased 309% during this time frame to $3.5 million. These increased expenses did not correspond with improvements in Top Ships' performance. During the first six months of the year the Company's operating loss had increased from approximately $150,000 to approximately $560,000 year-over-year, an increase of approximately 274%. Similarly, the Company posted a $5.8 million net income loss during the period, compared to a net income gain of $290,000 during the comparable period the prior year, a reversal of fortune of *more than 2,000%.*

69.　Top Ships' abysmal operating performance and the increased diversion of Company capital to Pistiolis since the Reverse Split Share Issuance Scheme was enacted further demonstrates that the scheme served no legitimate business purpose, but was rather a subterfuge designed to manipulate the market price of Top Ships' common stock in order to enrich Defendants and their affiliates.

70.　On August 8, 2017, Top Ships filed a report on Form 6-K disclosing that it had sold approximately 1.3 million shares to Kalani pursuant to the Stock Purchase Agreement since July 14, 2017 (the "August 8 Form 6-K") accounting for the 30-for-1 reverse stock split. Thus, on an *unadjusted* basis, the Company had sold to Kalani nearly *39 million* shares. As there were only approximately 1.9 million total shares outstanding as of the date of the August 8 Form 6-K (on an adjusted basis), this also meant that the number of Company shares issued and outstanding had approximately *tripled* in only about three weeks. This continued deluge of newly issued Top Ships shares did not account for the additional shares that may have been issued pursuant to the Series C Convertible Preferred Shares Purchase Agreement or the Warrants Registration Statement which would have further diluted and damaged shareholders. The August 8 Form 6-K also stated that $6.3 million worth of stock remained under the Stock Purchase

Agreement and that the Company still had more than 4,300 Series C Convertible Preferred Shares outstanding, indicating that the market manipulation and massive share dilution would continue.

71.     By August 17, 2017, as a result of Defendants' ongoing dilutive and manipulative conduct, the price of Top Ships common stock had declined to close at $1.31 per share. At this share price, Top Ships only had a market capitalization of about $***2.5 million*** (based on the number of 1.9 million Company shares outstanding as of August 8, 2017), ***despite having raised tens of millions of dollars from investors*** since February 2017. This shocking erosion in shareholder value was the direct result of Defendants' fraudulent scheme to manipulate the price of Top Ships common stock and induce purchases through the series of dilutive and manipulative stock offerings and reverse stock splits detailed herein.

72.     The following example illustrates the extent to which Defendants' conduct has manipulated the market for Top Ships common shares: If a shareholder held ***the entirety*** of the 5.7 million shares of Top Ships common stock outstanding as of February 2, 2017 – the date of the Stock Purchase Agreement with Kalani – this same shareholder, if it engaged in no other transactions, would own only 633 shares following the August 3, 2017 30-for-1 reverse stock split, ***a decline of more than 99%.*** Similarly, on an adjusted basis, the price of Top Ships common stock traded at over $20,000 per share early during the Class Period – stock which was worth ***only $1.31 per share*** as of August 17, 2017 – meaning shareholders have been almost completely wiped out.

73.     While shareholders have lost millions of dollars, Pistiolis, the Kalani Defendants and their affiliates have been enriched. Pistiolis has earned millions of dollars through brazen self-dealing, as offering proceeds have been used by the Company to acquire additional vessels,

largely in deals directly involving entities owned by Pistiolis and his family. He has also profited through his ownership of CSM, Central Mare, Family Trading and other entities that he controls, entitling him to proceeds and benefits in the financing, purchase, administration and maintenance of Company vessels. Similarly, Kalani has made millions of dollars in commission fees and profits from its resale of the discounted Top Ships common stock it purchased in the securities offerings to the investing public.

74.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

75.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Top Ships securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

76.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Top Ships securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Top Ships or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

77.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

78.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

79.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Top Ships;

- whether the Individual Defendants caused Top Ships to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Top Ships securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

80.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

81.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Top Ships securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Top Ships securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

82.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

83.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

84.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

85.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

86.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Top Ships securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Top Ships securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

87.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Top Ships securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Top Ships' finances and business prospects.

88.      By virtue of their positions at Top Ships , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

89.      Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Top Ships, the Individual Defendants had knowledge of the details of Top Ships' internal affairs.

90.      The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Top Ships. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Top Ships' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

the market price of Top Ships securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Top Ships' business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Top Ships securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

91.     During the Class Period, Top Ships securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Top Ships securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Top Ships securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Top Ships securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

92.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

93.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

94.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

95.    During the Class Period, the Individual Defendants participated in the operation and management of Top Ships, and conducted and participated, directly and indirectly, in the conduct of Top Ships' business affairs.  Because of their senior positions, they knew the adverse non-public information about Top Ships' misstatement of income and expenses and false financial statements.

96.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Top Ships' financial condition and results of operations, and to correct promptly any public statements issued by Top Ships which had become materially false or misleading.

97.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Top Ships disseminated in the marketplace during the Class Period concerning Top Ships' results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Top Ships to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Top Ships within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of Top Ships securities.

98.     Each of the Individual Defendants, therefore, acted as a controlling person of Top Ships.  By reason of their senior management positions and/or being directors of Top Ships, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Top Ships to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Top Ships and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

99.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Top Ships.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: August 24, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
          ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
peretz@bgandg.com

*Attorneys for Plaintiff*